UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:21-CV-00454-FDW-DSC

| | | |
|---|---|---|
| TIMOTHY ROCHELL CARAWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| CITY OF PINEVILLE, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THIS MATTER is before the Court on Defendants City of Pineville, Nicholas French, Leslie Gladden, Jamon Griffin, and Adam Roberts' Motion for Summary Judgment, (Doc. No. 10), and Plaintiff Timothy Rochell Caraway's Motion for Partial Summary Judgment, (Doc. No. 13). The motions have been fully briefed and are ripe for review. For the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Partial Summary Judgment.

I.      **BACKGROUND**[1]

Plaintiff Timothy Rochelle Caraway ("**Plaintiff**") filed this action asserting claims arising out of an officer-involved shooting during which Officers Adam Roberts ("**Roberts**") and Jamon Griffin ("**Griffin**") fired a total of twelve bullets, four of which struck Plaintiff. (Doc. No. 10; Doc. No. 13).

On the morning of February 1, 2020, the Pineville Police Department ("**PPD**") received a 911 call reporting "an African American male in a tan jacket, pointing a gun" on Polk Street near

---

[1] The background set forth herein is taken from a combination of the parties' briefing and attached exhibits. The background is taken in the light most favorable to Plaintiff as the nonmoving party.

1

the Arby's restaurant. (Doc. No. 16-7, p. 10). Officer Leslie Gladden ("**Gladden**") was in the dispatch center, and he immediately radioed the call location to other units then left with his partner, Officer Griffin. (Doc. No. 11, p. 2–3). Sergeant Nick French ("**French**") and Officer Roberts, in separate vehicles, were the first to reach Polk Street. Id. at 3. French saw the suspect described in the call, later confirmed to be Plaintiff, and informed the other responding officers of Plaintiff's exact location. Id. French then parked on the street to the south of Plaintiff, exited the vehicle with his department-issued patrol rifle, and began following Plaintiff from behind as he walked north on the west sidewalk of Polk Street. (Doc. No. 16-7, p. 13). At approximately the same time, Roberts began pursuing Plaintiff on foot, also from behind and with his department-issued rifle in-hand. Id. While French and Roberts closed the distance between themselves and Plaintiff, Gladden and Griffin arrived. Id. at 14. They exited their patrol car and similarly began to approach Plaintiff from behind with their department-issued rifles drawn. Id. at 15–16.

Plaintiff was alerted to the officers' presence when French issued the first of a string of commands, ordering Plaintiff to "get [his] hands up." Id. at 14. Plaintiff turned his head to his left and began raising his hands, in compliance with French's instruction, while Roberts and French both instructed Plaintiff to show his hands a second and third time. Id. at 19, 22. Gladden then noticed a dark object in Plaintiff's right hand, which was later confirmed to be a cell phone, and commanded Plaintiff to "drop the gun." Id. at 21. Plaintiff began to turn his body to his left towards French and Roberts. Id. Plaintiff then suddenly put his right hand into his jacket pocket and pulled out a dark semi-automatic handgun with the barrel facing French. Id. at 18. Plaintiff began to kneel on his right knee, raising his left hand and holding the gun lowered in his right hand, but with the barrel facing in the officers' direction. Id. at 32. At that time, French disengaged the safety on his firearm and prepared to shoot. Id. at 18.

Before French could fire, Roberts shot at Plaintiff. Id. at 23–25. Almost simultaneously, Griffin also fired. Id. at 28. Plaintiff began to fall forward immediately after the first shot, dropping his weapon either as he fell or when he hit the ground. Id. at 19. From their positions, neither Roberts nor Griffin could see Plaintiff's right hand, and as such neither saw him drop the weapon. Id. at 28–29, 25. Plaintiff laid face-down on the sidewalk but allegedly continued to move, and Roberts and Griffin continued to shoot until French and Gladden ordered them to stop. Id. They did not see the firearm lying in the grass next to Plaintiff until they approached him. Id.

As additional shots were fired, both French and Gladden saw Plaintiff fall and drop the firearm as he hit the ground. Id. at 19. They could see Plaintiff no longer held the gun, so they held their fire and yelled for their fellow officers to stop shooting, which they immediately did. Id. In total, the officers fired twelve shots—Roberts fired three, and Griffin fired nine. Id. at 6. Once the shooting stopped, Gladden and Roberts approached Plaintiff as he lied face down on the ground. (Doc. No. 16-7, p. 21). Gladden handcuffed Plaintiff's hands behind his back, and he and Roberts rolled Plaintiff over to check him for injuries. Id. Roberts then provided first aid until first responders arrived and took over Plaintiff's care. Id. at 27.

Plaintiff was taken to Atrium Hospital, where he remained for approximately forty-eight hours to receive treatment for four bullet wounds. Id. at 34; see also (Doc. No. 13, p. 2; Doc. No. 18, p. 4). According to PPD's Officer-Involved Shooting Internal Investigation ("**OISII**"), Roberts fired one shot that struck Plaintiff in the right shoulder, injuring his shoulder and neck. (Doc. No. 16-7, p. 21). Griffin fired one round that struck, but did not enter, Plaintiff's left forearm below his wrist; another that grazed the inside of his left first finger; and a third that struck the right rear flank of his torso. Id. at 34; see also (Doc. No. 8, p. 4).

Plaintiff was discharged from the hospital on February 3, 2020. (Doc. No. 10-7, p. 2).

3

Immediately thereafter, the Charlotte-Mecklenburg Police Department ("**CMPD**") placed Plaintiff under arrest and transported him to the Mecklenburg County Jail, without the PPD's involvement, based on four unrelated, outstanding arrest warrants. Id. The CMPD obtained those arrest warrants on January 4, 2019, for property and assault crimes that took place in 2018. Id. at 3–6. On the day of his arrest, Sergeant Richard Miller ("**Miller**"), who was working for PPD's Criminal Investigations Division at that time, obtained four additional arrest warrants relating to the officer-involved shooting. Id. at 1. Those included:

(1) Four counts of felony assault by pointing a firearm at law enforcement officers;
(2) Misdemeanor common law offense of going armed to the terror of the public by pointing a firearm at a civilian vehicle;[2]
(3) Misdemeanor unlawful carry of a concealed weapon; and
(4) Misdemeanor resist/delay/obstruct.

Id. After discovering Plaintiff's gun was reported stolen by its owner, Miller obtained a fifth warrant on February 5, 2020, charging Plaintiff with possession of a stolen firearm. Id. at 2. The District Attorney's Office ultimately dismissed all charges against Plaintiff in late 2020. Id.

On July 29, 2021, Plaintiff filed his Complaint in the Mecklenburg County Superior Court seeking compensatory and punitive damages against Defendants City of Pineville ("**Pineville**"), Roberts, Griffin, French, and Gladden. (Doc. No. 1, p. 1) Defendants removed the case to this Court on August 30, 2021. Id. The Complaint alleges seven claims for relief:

(1) Excessive Force Under 42 U.S.C. § 1983 Against Officer Roberts and Officer Griffin;
(2) Malicious Prosecution or Prosecution Without Probable Cause under 42 U.S.C. § 1983 Against PPD Defendants;
(3) Fabrication of Evidence under 42 U.S.C. § 1983 Against PPD Defendants;
(4) Failure to Train and or Supervise Under 42 U.S.C. § 1983 Against Sergeant French and Office[r] Gladden;
(5) Assault and Battery under North Carolina Law Against Defendants Roberts & Griffin;

---

[2] This offense relates to the 911 call precipitating the shooting, which reported "an African American male in a tan jacket, pointing a gun" on Polk Street. (Doc. No. 16-7, p. 10). Plaintiff admitted he pointed his gun at a female acquaintance's car after she held up her own gun and demanded he get in her car. (Doc. No. 10-8, p. 8).

(6) Malicious Prosecution under North Carolina State Law Against PPD Defendants; and

(7) False Arrest under North Carolina law (N.C.G.S. § 15A-401(a) to (f))

Id. at 21–32 (emphasis removed).  Both parties have moved for summary judgment, and these motions are ripe for ruling.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).  Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for

5

the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Id. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. Id. at 249-50. In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." Id. at 252.

### III.  ANALYSIS

#### A.  Section 1983 Claims

Defendant moves for summary judgment on Plaintiff's four causes of action pursuant to 42 U.S.C. § 1983: (1) excessive force against Roberts and Griffin; (2) malicious prosecution or prosecution without probable cause against all PPD Defendants; (3) fabrication of evidence against all PPD Defendants; and (4) failure to train and supervise against French and Gladden. While not a source of substantive rights, Section 1983 instead provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. Albright v. Oliver, 510 U.S. 266, 271 (1994). Section 1983 "imposes liability on any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" Doe v. Kidd, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983). Thus, the first inquiry is "whether the plaintiff has been deprived of a right 'secured by the constitution and laws.'" Baker v. McCollan, 443 U.S. 137, 140 (1979). Because Plaintiff has alleged four such deprivations, this Court will address each in turn.

6

## 1. Excessive Force Against Roberts and Griffin

Plaintiff asserts an excessive force claim against Roberts and Griffin, alleging that by "inflicting greater force than reasonably necessary to control or subdue Caraway, Defendant Officers Roberts and Griffin acted with deliberate indifference to Caraway's Fourth Amendment Right to be free from unreasonable seizure of his person." (Doc. No. 1-1, p. 13).[3] Defendants contend summary judgment is appropriate for two reasons: first, Roberts and Griffin are entitled to qualified immunity, and second, this claim fails on the merits because the shooting was lawful under the Fourth Amendment.

### i. Qualified Immunity

Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The doctrine balances two important values—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The Fourth Circuit has stated:

> The basic rules of § 1983 [qualified] immunity are well known . . . . The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

Rowland v. Perry, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted); see also Harlow v.

---

[3] Plaintiff also alleges Roberts and Griffin violated "his Fourteenth Amendment right to substantive due process precedent to the imposition of punishment in response to suspected criminal activity." (Doc. No. 1-1, p. 13–14). However, the Supreme Court held "*all* claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." Graham v. Connor, 490 U.S. 386, 395 (1989). As such, this Court addresses Plaintiff's excessive force claim only under the Fourth Amendment, "not the more generalized notion of 'substantive due process." Id.

Fitzgerald, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted). Thus, law enforcement officers "should prevail on an assertion of qualified immunity if a reasonable [officer] possessing the same information *could* have believed that his conduct was lawful." Gallimore v. Henrico Cnty. Sch. Bd., 38 F. Supp. 3d 721, 726 (4th Cir. 2014) (quoting Slattery, 939 F.2d at 216).

To determine whether qualified immunity applies, at the outset courts must "identify the specific right that the plaintiff asserts was infringed by the challenged conduct." Cooper v. Brunswick Cnty. Sheriff's Dep't, 896 F. Supp. 2d 432, 444 (4th Cir. 2012) (quoting Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999)). Next, courts must apply a two-prong test, first asking "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," Id. (quoting Pearson, 555 U.S. at 232); and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. Finally, courts "may answer either of these questions first," id. (citing Pearson, 555 U.S. at 236), and "if the answer to either question is 'no,'" the defendant is not entitled to the protection of qualified immunity. Id. (citing Reichle v. Howards, 566 U.S. 658, 663–64 (2012)).

Under the second prong's "clearly established" test, the "right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. (quoting Reichle, 566 U.S. at 664) (internal quotations and alteration omitted). To that end, "existing precedent must have placed the statutory or constitutional question beyond debate," id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)), "such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." Id. (quoting

Wilson, 141 F.3d at 114).  Finally, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014).  Thus, this Court must determine whether Roberts and Griffin's decisions to shoot Plaintiff was proscribed by clearly established law.  Based on the record, the "'clearly established' standard is not satisfied here." Reichle, 566 U.S. at 664.

Plaintiff contends Roberts and Griffin violated two specific clearly established laws.  First, Plaintiff argues it was clearly established in February 2020 that the Fourth Amendment proscribes shooting a victim who merely grasps a firearm in a non-threatening manner.  In this assertion, Plaintiff is correct.  Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013) ("[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force.").  Instead, the officer must reasonably believe they are "*threatened* with the weapon."  Id. (finding excessive force where the officers failed to identify themselves and plaintiff simply "stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground").  Here, the facts show the threat was real.  Plaintiff abruptly placed his hand in his pocket and pulled out his firearm as the officers approached.  A reasonable jury could find the officers were justified in interpreting this sudden act as a threat.  The officers fired as he withdrew his firearm, so even taking Plaintiff's contention that he never pointed the weapon directly at the officers as true, they were not required to wait to see whether Plaintiff ever did.  Therefore, Plaintiff's argument fails because the facts support the reasonable perception of a threat.

Second, Plaintiff argues it was clearly established in February 2020 that shooting at an incapacitated suspect lying on the ground is a Fourth Amendment violation.  As above, while Plaintiff's recitation of the law is correct, the facts do not support its application here.  See, e.g., Meyers v. Baltimore Cnty., 713 F.3d 723 (4th Cir. 2013) (denying qualified immunity where the

9

officer continued to tase the plaintiff after seeing him drop his weapon and fall to the ground); Brockington, 637 F.3d at 507 (denying qualified immunity where the officer approached the plaintiff as he lay on the ground, saw he was unarmed, and then fully discharged his clip); Estate of Jones v. City of Martinsburg, 961 F.3d 661, 664–70 (4th Cir. 2020) (denying qualified immunity where the plaintiff was armed, but was secured by multiple officers and was visibly "helpless and immobilized").   Here, the facts do not demonstrate Plaintiff was clearly incapacitated.  He was not "gurgling . . . [or] struggling to breath," id. at 669, secured by other officers, id., or "stiffened" and "rigid."  Meyers, 713 F.3d at 733.  The officers did not approach Plaintiff after he stopped moving, only to fire again.  See Brockington, 637 F.3d at 507.  Neither Roberts nor Griffin could see Plaintiff drop his weapon, so they continued shooting—for 3.5 seconds without pause—based on their perception that Plaintiff was still moving, armed, and dangerous.  Thus, Plaintiff's second argument is also unsuccessful.  Because Plaintiff has not shown Roberts and Griffin did violate any clearly established law, the Court holds Defendants are entitled to qualified immunity as to the Section 1983 excessive force claim.  Furthermore, the Court finds Plaintiff claim fails not only on this ground, but also on the merits.

ii.   Defendants' Motion for Summary Judgment

The Supreme Court has held that where "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment," which "guarantees citizens the right 'to be secure in their persons . . . against unreasonable seizures' of the persons."  Graham v. Connor, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV).  The Fourth Circuit has previously explained,

Claims that law enforcement officers used excessive force when making an arrest "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham, 490 U.S. at 395 . . . .  The standard of review is an objective one.  The intent or motivation of the officer is irrelevant; the question is whether a

> reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. Id. at 396–97 . . . . A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others. Tennessee v. Garner, 471 U.S. 1 . . . (1985).
>
> This circuit has recognized the doctrine of qualified immunity in excessive force cases, and the inquiry under Graham must reflect the considerations underlying the analysis of an immunity defense. See Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991). A reviewing court may not employ the "20/20 vision of hindsight" and must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97 … The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection. Greenridge v. Ruffin, 927 F.2d 789, 791-92 (4th Cir. 1991) (citing Graham, 490 U.S. 386).

Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). Moreover, it is well settled that "[t]he Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Id. at 641. Thus, Graham establishes three non-exclusive factors for analyzing a claim of excessive force under the "reasonableness" standard: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. In this case, all three factors weigh in the officers' favor.

First, the officers' response was objectively justified and reasonable considering the perceived severity of the crime at issue. Id. The officers were responding to a 911 call reporting "an African American male in a tan jacket, pointing a gun." (Doc. No. 16-7, p. 10–11). Even if, as Plaintiff alleges, the "officers likely possessed insufficient evidence to suspect even [a] misdemeanor offense," (Doc. No. 18, p. 12), this attempt to downplay the severity of the crime is unpersuasive. Further, even if the officers "possessed no knowledge that the suspect fired a weapon, . . . committed an assault, or made verbal threats," it does not necessarily follow that their actions were unreasonable. Id. at 12. Instead, the information available indicated Plaintiff

matched the 911 call's physical description and was reportedly pointing an "automatic all black" handgun on a public road, conduct carrying a high risk of severe danger. Id. at 10–11. Therefore, based on the information available and the perceived severity of the crime necessitating their response, it was objectively reasonable for Roberts and Griffin to respond as they did.

Second, Roberts and Griffin reasonably perceived a threat not just to their own safety, but also to the safety of the other officers and of the public. See Graham, 490 U.S. at 396–97. In quick succession, the officers ordered Plaintiff to show his hands and commanded him to drop the gun. Plaintiff then turned, thrust his right hand into his pocket, and pulled out a handgun with the barrel facing the officers. Under these circumstances, it was reasonable for Roberts and Griffin to perceive an immediate threat of serious physical harm. This is especially true considering the first two shots were fired within seven seconds of the first command for Plaintiff to show his hands, (Doc. No. 16-7, p. 17, 28), and all twelve shots were fired in the next 3.5 seconds. (Doc. No. 11, p. 6; Doc. No. 11, Ex. A, 2:32–2:36). In mere seconds, Plaintiff went from being unaware of the officers' presence to pulling his firearm out of his pocket with the barrel pointing towards those officers. This is just the "split-second judgment" Graham warned of. Thus, it was objectively reasonable to perceive Plaintiff posed a threat to the officers' safety, and the use of force in response to that threat was appropriate.

Third, it was reasonable for Roberts and Griffin to infer that, by suddenly removing his firearm from his pocket, Plaintiff created the real possibility that he may be attempting to resist or evade arrest. Even if Plaintiff merely intended to comply with the commands to drop his weapon, it does not follow that this unspoken intent must have been clear to the officers. (Doc. No. 18, p. 9). The Fourth Circuit has repeatedly held that in employing deadly force "the Fourth Amendment does not require omniscience." Elliott, 99 F.3d at 644 (citing Greenidge, 927 F.2d

12

789; <u>Slattery</u>, 939 F.2d 213).  Instead:

> police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.

<u>Id.</u>  The law does not require police officers to read armed suspects' minds, or to inquire about a suspect's unspoken intent before acting.  Roberts and Griffin were not required to wait to see whether Plaintiff, by drawing his weapon, meant to drop it or fire at them.  In a split second, they perceived a threat, so they pulled their triggers before Plaintiff had the chance to do the same.

Therefore, all three <u>Graham</u> factors weigh in favor of Defendants Roberts and Griffin reasonably perceiving, and responding to, a deadly threat.  The reasonableness analysis does not ask what Plaintiff meant to do, or what the officers should have known based on Plaintiff's unspoken subjective intent.  Instead, it asks "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." <u>Graham</u>, 490 U.S. at 396–97.  Here, Roberts and Griffin fired their weapons only after Plaintiff withdrew his own.  They continued firing for as long as they believed he still held his firearm, and they ceased the moment they knew he did not.  This Court finds that a reasonable officer in the same circumstances, facing an armed suspect who drew his weapon only after being approached by four armed officers, would have likewise concluded this suspect posed a threat justifying the use of deadly force.

Arguing against summary judgment, Plaintiff attempts to demonstrate genuine issues of material fact as to whether Defendants Roberts and Griffin reasonably perceived an imminent threat when they fired twelve times.  These include whether: (1) Plaintiff was attempting to comply with "conflicting" commands; (2) Plaintiff was attempting to comply with Gladden's command to drop the gun when he removed it from his pocket; and (3) Roberts "knew [P]laintiff

13

would retrieve his gun so that he could drop it." (Doc. No. 18, p. 7–9). However, even taking these facts as true, they are not genuine issues of material fact related to whether Roberts and Griffin objectively and reasonably perceived an imminent threat. Instead, Plaintiff's assertions attempt to explain his subjective motivations and thus what he believes the officers should have known. But as Defendants correctly state, Plaintiff's subjective intent to comply "is not the legal issue before this Court." (Doc. No. 20, p. 2). Instead, the Court must determine whether it was reasonable to perceive Plaintiff's act of suddenly drawing his firearm as an immediate threat.

The Fourth Circuit addressed this same issue in Elliott v. Leavitt, 99 F.3d at 641. Prior to an officer-involved shooting, the responding officers handcuffed Elliott's hands behind his back and placed him in the police car with his seatbelt fastened. Id. Moments later Elliott had shifted in his seat and was pointing a gun at them. Id. at 642. When he ignored the officers' demands to drop his weapon, the officers fired twenty-two times, killing Elliott. Id. The plaintiffs attempted to argue Elliott "did not pose a real threat to the officers." Id. The District Court agreed, reasoning "arguably it [was] not clear what [Elliott was] intending to do with the weapon." Id. at 643. The Fourth Circuit reversed, explaining "even if Elliott's specific intent were relevant, it is not clear what other evidence of intent the district court would require—Elliott was pointing his gun at the officers . . . and ignored the order to drop his weapon." Id. The Court held that the "Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." Elliott, 99 F.3d at 643.

Similarly, Roberts and Griffin were not expected to wait to find out if, after removing his firearm, Plaintiff merely intended to drop it. Neither were the officers expected to know whether Plaintiff only removed it to comply with their commands—his subjective intent is irrelevant. Like in Elliott, the officers reasonably perceived Plaintiff's sudden withdrawal of his firearm as a

14

threat.  Further, unlike in Elliott, Plaintiff was neither handcuffed nor in the police car, but was instead on a public street.  "No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life."  Id. at 644.  Plaintiff's alleged factual disputes do not demonstrate the existence of genuine issues of material fact and "do not alter the inescapable conclusion that the officers were confronted with a serious threat to their safety."  Id. at 645.

Plaintiff next cites a number of factual allegations he claims demonstrate the unreasonableness of the officers' actions: (1) Plaintiff did not point his firearm at the officers; (2) Plaintiff was attempting to comply with, not to evade, the officers' commands; (3) "it is undisputed that there was a precise sequence to the gunshots;" (4) Griffin fired most, if not all, of his shots while Plaintiff lay face-down on the sidewalk; and (5) Plaintiff was no longer armed when he sustained the gunshot wounds.  Id. at 9–13.  Again, to the extent these facts go to Plaintiff's subjective intent, they are neither relevant nor dispositive.  Further, even if they are taken as true, these facts do not preclude this Court from finding Roberts and Griffin's actions were reasonable.  Instead, "[t]hese distinctions prove no more than that every case has its own facts."  McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994).

The Fourth Circuit does not "require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing," and the Court "will not second-guess the split-second judgment of a trained police officer . . . particularly where inaction could have resulted in death or serious injury to the officer[s] and others."  Id.; see also Greenidge v. Ruffin, 927 F.2d 789 (4th Cir. 1991) (holding the officer's use of deadly force was justified where the plaintiff reached for what she thought was a shotgun but was actually a wooden nightstick); Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991) (holding an officer's use of deadly force was

justified, despite not identifying the object he saw in the plaintiff's hand before shooting). Thus, even if Plaintiff did not point his firearm directly at the officers, they were faced with a split-second judgment and determined Plaintiff's withdrawal of his firearm constituted a threat. The suggestion that the officers could have waited is "more reflective of the 'peace of a judge's chambers' than of a dangerous and threatening situation on the street." Elliott, 99 F.3d at 643 (citing Graham, 490 U.S. at 396).

Further, Plaintiff's contentions that he was lying face-down and unarmed on the sidewalk when most of the shots were fired do not demonstrate the clear unreasonableness of the officers' actions. (Doc. No. 18, p. 9–13). Plaintiff is correct that reasonableness "is determined based on the information possessed by the officer at the moment that force is employed," and that reasonableness must be analyzed on a shot-by-shot basis. Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) (citing Elliott, 99 F.3d at 643). Here, the information Roberts and Griffin had did not change throughout the 3.5 seconds during which they fired. Thus, neither did their assessment of the threat. From their vantage point, neither officer could see Plaintiff drop his firearm, so it was objectively reasonable to continue firing to eliminate that threat.

Further, the Fourth Circuit held the exact sequence and number of shots fired alone "cannot be determinative as to whether the force used was reasonable." Elliott, 99 F.3d at 643. In so holding, the Court emphasized: "[b]oth officers fired almost simultaneously; neither officer emptied his gun; and the evidence indicates that the shooting took place within a matter of seconds." Id. The facts underlying this Court's analysis are similar: Roberts and Griffin both fired almost simultaneously;[4] twelve shots were fired but neither officer emptied his clip; and the

---

[4] Plaintiff contends it is undisputed that there was a precise sequence to the gunshots, with Defendant Roberts firing before Defendant Griffin started to fire. However, PPD's OISII report contradicts this: "Because there is no audio for Officer Griffin's BWC, this investigator is unable to determine the time in which the first of Officer Griffin's nine gunshots were fired." (Doc. No. 16-7, p. 38). Plaintiff was on his right knee with his left arm raised and his

16

shooting lasted 3.5 seconds. Therefore, the sequence and number of shots fired "does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat." Id.

Finally, Plaintiff argues that even if Roberts reasonably perceived a threat when he fired his shots, a reasonable jury could conclude to the contrary for Griffin. Plaintiff relies on several cases to support his position, including Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005); Williams v. Strickland, 917 F.3d 763, 769 (4th Cir. 2019); and Brockington v. Boykins, 637 F.3d 503, 507 (4th Cir. 2011). The cases emphasize that force is only justified while the threat is immediate, and that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Waterman, 393 F.3d at 481. However, the case law Plaintiff cites is distinguishable. As explained above, the threat to the officers and the public had not clearly been eliminated. Plaintiff had not fled, nor was he clearly unarmed, and Officers Roberts and Griffin did not approach Plaintiff as he lay on the sidewalk then, seconds later, proceed to shoot him. See Brockington, 637 F.3d at 507. Instead, they reasonably believed Plaintiff was still a threat. Thus, Plaintiff's claim for excessive force under Section 1983 fails on the merits because the officers' perception of a threat and resulting decision to shoot were objectively reasonable. Therefore, Defendants are entitled to summary judgment on this claim as a matter of law.

### iii. Plaintiff's Motion for Summary Judgment

The Court now turns to Plaintiff's motion for summary judgment, wherein Plaintiff seeks

---

firearm in his right hand at 15:06:49, Plaintiff. Id. at 24. At 15:06:50, bodycam footage shows smoke coming from Roberts's firearm and Plaintiff laying on the sidewalk. Id. at 22. Plaintiff sustained gunshot wounds to his left forearm and finger, and the ISS investigator stated, "there is a high probability that Officer Griffin while deploying his handgun, struck the suspect in these areas as his arm was raised in the air." Id. at 34. Together, these facts show regardless of who fired first, they fired nearly simultaneously.

judgement in his favor on his Section 1983 excessive use of force claim against Griffin. (Doc. No. 13-1). The Court rejects Plaintiff's arguments that track those made in opposition to Defendants' motion for the reasons set forth above. Further, the additional arguments Plaintiff makes in favor of his own motion are similarly unpersuasive.

Plaintiff argues Graham stands for the proposition that when "this Court examines whether the use of force was reasonable from an objective officer standard, it must consider Griffin's subjective mental status to determine whether a reasonable officer would have come to the same conclusions." (Doc. No. 13-1, p. 8 (citing Graham, 490 U.S. at 396)). However, this is a gross misreading of the law—as set forth above, Graham clearly holds that Supreme Court precedent "make[s] clear [that subjective motivations of individual officers have] no bearing on whether a particular seizure is 'unreasonable.'" Graham, 490 U.S. at 398–99. The Court underscores this holding by declaring "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts . . . have no proper place in that inquiry." Graham, 490 U.S. at 398–99. Thus, this Court similarly rejects Plaintiff's attempts to call into question Griffin's subjective state of mind.

Next, Plaintiff makes the conclusory assertion that his "expert witness, the fellow police officers, and Defendant Griffin all agree that [] Griffin fired shots after the threat—if any—had been eliminated." Id. at 9 (emphasis in original). This mistaken conclusion is based upon 20/20 hindsight, relying on irrelevant and unsupported assertions that "at least two of Defendant's colleagues"—not Defendant—"perceived in real time that Mr. Caraway's handgun . . . had been neutralized prior to [] Griffin firing his nine shots." Id. at 8. Plaintiff's motion, then, violates the teaching of Graham, which requires this Court to focus not on the perceptions of other witnesses, but on "whether a reasonable officer in the same circumstances [as the officer in question] would

have concluded that a threat existed justifying the particular use of force." Elliott, 99 F.3d at 642 (citing Graham, 490 U.S. at 396-97). Therefore, the Court rejects these attempts to challenge Griffin's conduct as unreasonable. (Doc. No. 13-1, p. 8, 9, 12, 13).

Further, Plaintiff cannot assert in one briefing that "there are numerous genuine issues of material fact going to whether . . . Griffin reasonably perceived an imminent threat," (Doc. No. 18, p. 7), and in another that "Griffin fails to place material facts into dispute that would preclude summary judgment as to Fourth Amendment excessive force." (Doc. No. 19, p. 2). For the same reasons already discussed, while the parties differ in their characterization of Plaintiff's conduct as threatening, these disputed facts, and the evidence on the record, do not suffice to create any genuine issues of material fact precluding summary judgment as a matter of law. Therefore, the Court GRANTS summary judgment in favor of Defendants as to the Section 1983 excessive force claim and DENIES Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 13).

**2. Malicious Prosecution Against All PPD Defendants**

Defendant contends summary judgment is appropriate as to Plaintiff's malicious prosecution claim against all PPD Defendants. Plaintiff alleges "Officers Roberts, French, Griffin, and Gladden, despite knowing that probable cause did not exist to arrest and prosecute Plaintiff intentionally, recklessly, and with malice, caused Plaintiff to be arrested, held on bail, and prosecuted." (Doc. 1-1, p. 25). Specifically, Plaintiff asserts that when the four officers gave their statements describing the shooting to the prosecutors and the court, they provided false or misleading information and made material omissions that resulted in Plaintiff's arrest and prosecution.

Malicious prosecution claims seek to "redress[] injuries a plaintiff sustains as a result of defendant's improper initiation or maintenance of formal proceedings against him." Owens v.

Balt. City State's Attorneys Office, 767 F.3d 379, 390 (4th Cir. 2014). Such a claim "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) (quoting Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000)). To prevail, a plaintiff must prove " the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans, 703 F.3d at 647. Additionally, malicious prosecution:

> require[s] a demonstration of both but-for and proximate causation. . . . Accordingly, subsequent acts of independent decision-makers (*e.g.*, prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure. . . . Such intervening acts of other participants in the criminal justice system' insulate a police officer from liability.

Id. (internal citations and quotations omitted). Thus, "in the absence of evidence that [the officer] misled or pressured the prosecution," the officer will not be liable. Id. Neither party disputes that the criminal proceedings terminated in Plaintiff's favor when the charges against him were dismissed. (Doc. No. 1-1, p. 25; Doc. No. 10-7, p. 2). Thus, the Court must determine whether Plaintiff has met his burden as to the first two elements such that a reasonable jury could find Defendants caused his seizure, and that this seizure was not supported by probable cause.

At the outset, Defendants are entitled to qualified immunity on Plaintiff's malicious prosecution claim. While Defendants asserted qualified immunity as an affirmative defense, (Doc. No. 2, p. 4), neither party provided any arguments concerning this issue in their briefings. Nevertheless, the Court finds its application is appropriate here. As set forth in the excessive force analysis, to overcome the application of qualified immunity, the plaintiff must demonstrate both a violation of a constitutional right and that the right at issue was clearly established at the time the defendant allegedly violated it. Cooper, 896 F. Supp. 2d at 444 (4th Cir. 2012). Where

an arrest is based on probable cause, it cannot constitute a constitutional violation. <u>McKinney v. Richland Cnty. Sheriff's Dep't</u>, 431 F.3d 415, 418 (4th Cir. 2005). As such, Plaintiff must have sufficient evidence showing probable cause did not exist for his arrest, not only to avoid qualified immunity's application, but also to prevail on the merits of the malicious prosecution claim.

Based on the record, Plaintiff has failed to prove the first element of this claim—that Defendants caused him to be seized. Defendants move for summary judgment on this point, arguing none of the four Defendants caused Plaintiff to be seized pursuant to legal process. Instead, Defendants have presented undisputed evidence showing Miller sought and obtained the warrants for Plaintiff's arrest following the officer-involved shooting. (Doc. No. 10-7, p. 1). Miller was not present for the confrontation, nor is he a named party in this action. <u>Id.</u> Following his investigation, he—not the officer Defendants—appeared before a magistrate judge seeking "whatever criminal charges [the magistrate judge] deemed appropriate." <u>Id.</u> This was two days after the shooting, and his report to the magistrate included footage from the officers' body-worn cameras. <u>Id.</u> The judge found probable cause to issue four arrest warrants. <u>Id.</u> Two days after the arrest, Miller obtained a fifth warrant upon confirming Plaintiff's firearm had previously been reported stolen by its owner. <u>Id.</u> at 2. Plaintiff presents no evidence disputing these facts, and as such, the Court agrees with Defendants and finds Defendants did not cause Plaintiff to be seized.

Plaintiff attempts to argue Defendants are liable because they initiated, continued, advised, or instigated his prosecution through false statements and omissions. <u>Id.</u> at 23.[5] Plaintiff merely cites <u>Stewart v. Sonneborn</u>, 98 U.S. 187 (1879) to suggest an initiator or instigator of a

---

[5] Plaintiff states, "Defendant makes the argument that one who only furnishes information, but does not initiate, continue, advise, or instigate a prosecution is not liable for malicious prosecution; however, such standard may be relaxed when the information is furnished by a police officer." (Doc. No. 18, p. 23–24). Plaintiff provides no legal support for his assertion, but his summary of Defendants' argument correctly states the law: where an independent decision-maker causes the seizure, the officer will not be liable unless there is evidence the officer "misled or pressured the prosecution." <u>Evans</u>, 703 F.3d at 647. As described herein, Plaintiff has presented no such evidence.

criminal proceeding is a proper defendant for a malicious prosecution claim, without further explanation. While that is true, the Supreme Court further held that probable cause to institute proceedings constitutes a complete defense to malicious prosecution claims. Stewart, 98 U.S. at 195.[6] Therefore, rather than showing Defendants caused his seizure, Stewart strengthens Defendants' argument in support of summary judgment. Thus, because Plaintiff presented no evidence showing Defendants caused his seizure, his malicious prosecution claim fails. Further, even if Plaintiff had satisfied the first element of his malicious prosecution claim, it would still fail because Plaintiff has not shown there was no probable cause for his arrest.

The second element for a malicious prosecution claim requires the plaintiff prove the allegedly wrongful seizure was not supported by probable cause. Evans, 703 F.3d at 647. Where an arrest is based on a warrant, the plaintiff must satisfy a two-prong test. Id. at 650. "First, plaintiffs must allege that defendants 'knowingly and intentionally or with a reckless disregard for the truth' either made false statements in their affidavits or omitted facts from those affidavits, thus rendering the affidavits misleading." Id. (quoting Franks v. Delaware, 438 U.S. 154, 155–56 (1978)). Second, the plaintiff must establish that those "false statements or omissions [are] material, that is, necessary to a neutral and disinterested magistrate's authorization of the search." Evans, 703 F.3d at 650 (quoting Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007)) (internal quotations omitted). The Court must then "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." Id. (quoting Franks, 438 U.S. at 156). "If the Plaintiff

---

[6] In Stewart, the Supreme Court considered whether creditors who instituted a bankruptcy suit were liable to the debtor for malicious prosecution when the debtor was later found not to be indebted to them. Stewart, 98 U.S. at 195. The Supreme Court held that, "weighed in view of what appeared to them when they filed their petition," as long as the creditors "had an honest and reasonable conviction that the plaintiff was their debtor . . . they had probable cause for instituting the proceedings." Id. at 195. As such, they had a complete defense to the claim. Id.

does not show that probable cause was lacking, summary judgment in favor of the officer is appropriate." Wilkerson v. Hester, 114 F. Supp. 2d 446, 450 (W.D.N.C. 2000).

The test for probable cause "to justify an arrest [requires showing] facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed … an offense." Humbert, 866 F.3d at 555 (citing Cahaly v. Larosa, 796 F.3d 399, 407 (4th Cir. 2015)). This inquiry, judged on the totality of the circumstances, involves consideration of two factors: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016). "An arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." District of Columbia v. Wesby, 138 S.Ct. 577, 584 n.2 (2018) (citing Devenpeck v. Alford, 543 U.S. 146, 153–55 (2004)); see also Wilkerson, 114 F. Supp. 2d at 451. Thus, if there was probable cause for at least one of the charges for which Plaintiff was arrested, Plaintiff's malicious prosecution claim will fail both on the merits and on the application of qualified immunity.

Defendants assert there was probable cause for most, if not all, of the charged offenses, which is sufficient to defeat Plaintiff's malicious prosecution claim. In response, Plaintiff merely concludes, without providing any evidence or explanation, that there was no probable cause for his arrest. (Doc. No. 18, p. 23).[7] The Court agrees with Defendants, and the existence of probable cause precludes Plaintiff's malicious prosecution claim.

Plaintiff was arrested pursuant to warrants issued by a neutral magistrate for the following offenses: (1) felony assault by pointing a firearm at the officers; (2) misdemeanor common law

---

[7] Plaintiff also argues summary judgment as to the malicious prosecution, false imprisonment, and fabrication of evidence claims is improper "because the material facts are in substantial dispute." (Doc. No. 18, p. 23). However, Plaintiff does not elaborate what those facts are, nor does he cite any evidence demonstrating they are in dispute. Thus, the Court rejects this argument. See Celotex Corp., 477 U.S. at 323.

offense of going armed to the terror of the public by pointing a firearm at a civilian vehicle;
(3) misdemeanor unlawful carry of a concealed firearm; (4) misdemeanor resist/delay/obstruct;
and (5) possession of a stolen firearm. (Doc. No. 10-7, p. 1). Plaintiff's attempt to attack three
of the five charges against him is futile.[8] (Doc. No. 101, p. 20–23). As Defendant points out, it
is undisputed that Plaintiff was in fact carrying a concealed weapon without a permit at the time
of the shooting, in violation of N.C.G.S. § 14-269(a1). (Doc. No. 11, p. 16; Doc. No. 10-7, p. 1).
It is also undisputed that Plaintiff's weapon had been reported stolen by its original owner,
supporting Plaintiff's charge for violating N.C.G.S. §§ 14-71.1 and 14-72(b)(4)–(c). (Doc. No.
10-7, p. 1). Thus, the record clearly supports the existence of probable cause for both charges,
notwithstanding the District Attorney's later decision to dismiss them. See Michigan v.
DeFillippo, 443 U.S. 31, 36 (1979) (holding the subsequent dismissal is irrelevant to the validity
of the arrest). As a result, the Court need not determine whether Defendant did in fact make false
or misleading statements or omissions that were material to the magistrate's finding of probable
cause.[9] Notwithstanding the alleged false statements and omissions, there was probable cause to
arrest Plaintiff for two of the five offenses with which he was charged. Therefore, the Court finds

---

[8] Plaintiff contends these facts show there was no probable cause to arrest him based on the first, second, and fourth charges: (1) "there was no objectively reasonable basis for believing that [Plaintiff] had committed the offense of going armed to the terror of the public," (2) Defendants knew Plaintiff did not raise and point his firearm at them but stated otherwise, (3) Defendants knew Plaintiff complied with their instructions but omitted this fact, and (4) Defendants knew Plaintiff did not assault any of the responding officers but gave this false allegation to the DA, again challenging the first charge. Id. at 20–23. However, even taking these assertions as true, they do not negate the existence of probable cause for the firearm-specific charges.
[9] Although the Court does not address the issue, the evidence suggests the alleged false statements and omissions were neither knowingly, intentionally, or recklessly false, nor were they material to the magistrate's finding of probable cause. Evans, 703 F.3d at 647. Plaintiff asserts Defendants knew he did not raise and point his firearm at the officers, he complied with the officers' instructions prior to the shooting, and he did not assault the officers, but they said otherwise in the interviews and arrest documents. (Doc. No. 1-1, p. 25). However, even if they are true, these contentions were not material to the finding probable cause. It is undisputed that Plaintiff quickly withdrew his firearm in the officers' presence, and they immediately fired. As explained above, these assertions do not alter the Court's finding that the officers were justified in perceiving this act and the surrounding circumstances as a threat, permitting the use of deadly force. Thus, even viewed in the light most favorable to Plaintiff, his arguments do not materially alter the determination that there was probable cause for his arrest.

Plaintiff's malicious prosecution claim also fails at the second element.[10]

Therefore, the Court finds Plaintiff's malicious prosecution claim fails, both on qualified immunity grounds and on the merits, and Defendants are entitled to summary judgment on this claim as a matter of law.

### 3. Fabrication of Evidence Against All PPD Defendants

The Court next turns to Plaintiff's fabrication of evidence claim against all Defendants. The "Fourteenth Amendment protects against deprivations of liberty accomplished without due process of law." Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014) (quoting Baker v. McCollan, 443 U.S. 137, 145 (1979)) (internal quotations omitted). Courts have consistently "recognized a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." Id. (quoting Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005)) (citations and internal quotations omitted). Fabrication of evidence alone, however, is insufficient to state a claim for a due process violation. Id. A plaintiff must also plead "adequate facts to establish that the loss of liberty—i.e., his conviction and subsequent incarceration—resulted from the fabrication." Id. (citing Washington, 407 F.3d at 282-83) (citation omitted).

In the instant action, Plaintiff asserts that, despite knowing that Plaintiff did not assault any officer, Defendants forwarded the false allegations and false information to the District

---

[10] The Court further notes that there was likely sufficient probable cause for the misdemeanor charge of going armed to the terror of the public. It is undeniable that the PPD received a 911 reporting a man pointing an automatic handgun gun on a public road, that Plaintiff matched the call's description, and that Plaintiff withdrew his firearm in the presence of the officers. (Doc. No. 16-7, p. 6, 8, 10, 18; Doc. No. 18, p. 2–4). This charge merely requires that the accused was: "(1) armed with unusual and dangerous weapons, (2) for the unlawful purpose of terrorizing the people of the named county, (3) by going about the public highways of the county, (4) in a manner to cause terror to the people." State v. Staten, 232 S.E.2d 488, 490 (N.C. Ct. App. 1977) (citing State v. Dawson, 159 S.E.2d, 11–12 (N.C. 1968)). Plaintiff was armed with a handgun, was arguably armed for the unlawful purpose of terrorizing people given that he used the firearm to threaten another motorist, was on the public road, and was seen by at least two other people pointing his firearm. (Doc. No. 16-7, p. 8–9). Based on these facts, a reasonable officer would believe Plaintiff had committed the crime of going armed to the terror of the public.

Attorney and this fabrication of evidence violated Plaintiff's rights and caused him to be wrongfully arrested, charged, and incarcerated. Notwithstanding the allegations in his Complaint, Plaintiff does not dispute Defendants' assertion that the District Attorney dismissed all charges and Plaintiff never went to trial. (See Doc. No. 11, p. 17). Accordingly, the alleged fabricated statements did not result in any loss of Plaintiff's liberty. See Bell v. Wolfish, 441 U.S. 520, 533–34 (1979) ("[T]he Government may permissibly detain a person suspected of committing a crime prior to a formal adjudication of guilt."); Gerstein v. Pugh, 420 U.S. 103, 120 (1975) (holding the standard for determining whether there is probable cause for detaining an arrestee pending further proceedings "is the same as that for arrest . . . probable cause to believe the suspect has committed a crime."). Because Plaintiff failed to show the requisite deprivation of liberty, this Court need not discuss the additional requirements for fabrication claims.[11] Therefore, the Court finds judgment as a matter of law in Defendants' favor appropriate as to Plaintiff's fabrication of evidence claim.

### 4. Failure to Train and/or Supervise Against French and Gladden

In his fourth Section 1983 claim, Plaintiff asserts French and Gladden failed to properly supervise Griffin when they allowed Griffin to respond to the scene and confront Plaintiff, despite having actual knowledge of Griffin's need for better and additional training and supervision. In their motion, Defendants correctly argue the notion that an individual co-worker such as Gladden, or a first level supervisor such as French, can be held liable for a failure to train or supervise, is

---

[11] While not reaching the issue, the Court notes that even had Plaintiff shown a loss of liberty, Plaintiff fails to produce evidence demonstrating the alleged statements were fabricated. Plaintiff's allegations are the same as those for malicious prosecution. (Doc. No. 1-1, p. 25). However, as Defendants assert, these allegations reflect Plaintiff's disagreement with the characterization of his conduct as "threatening and assaultive." (Doc. No. 11, p. 2). To succeed, Plaintiff was required to show "proof that [Defendants] fabricated evidence and that the fabrication resulted in the deprivation of [Plaintiff's] liberty." Washington, 407 F.3d at 282. Viewing the allegations in the light most favorable to Plaintiff, even if the statements were fabricated, his arrest and incarceration would still have been valid because probable cause existed for the firearm-specific offenses.

26

simply not the law.  See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) ("In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").  Plaintiff failed to respond to this argument.  In any event, the Court finds Defendants are entitled to judgment as a matter of law as to Plaintiff's "failure to train and supervise" claim.

To succeed on a failure to supervise or train claim, the plaintiff must prove three elements: "(1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights." Gallimore, 38 F. Supp. 3d at 726.  Thus, the "pertinent question on causation will be, "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" Buffington v. Baltimore Cnty., Md., 913 F.2d 113, 122 (4th Cir. 1990) (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)).  The answer here favors Defendants.

As to the first element, a "claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation of the person being supervised." Cooper, 896 F.2d at 451 (citing Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 724 (4th Cir. 1991).  Plaintiff contends Griffin violated his constitutional rights under the Fourth Amendment by using unjustified excessive force.  (Doc. No. 1-1, p. 27).  However, the Court has already determined Griffin's use of force was justified, and thus did not violate the Fourth Amendment.  Therefore, Plaintiff's failure to train and/or supervise claim fails because he has not provided any evidence demonstrating Griffin violated his constitutional rights.

27

Further, even if Plaintiff had satisfied the first element, his claim would still fail because Plaintiff has not satisfied the second element of a failure to train claim. For this element, a plaintiff must show that the supervisor's failure to train reflects "a deliberate indifference to the rights of persons with whom the police come in contact." Buffington, 913 F.2d at 122 (quoting Canton, 489 U.S. at 388). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997); see also Cooper, 896 F.2d at 451 (holding deliberate indifference can be shown by evidence of "a supervisor's continued inaction in the face of documented widespread abuses."). However, it "is well settled that 'isolated incidents' of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes." Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003) (citing Carter v. Morris, 164 F.3d 215, 220 (1999)). Instead, the plaintiff must show "numerous particular instances." Id. (quoting Kopf v. Wing, 942 F.2d 265, 269 (4th Cir. 1991)). Thus, Plaintiff had to provide proof that French and Gladden were deliberately indifferent to a known or obvious consequence of their alleged failure to train, this failure occurred despite knowledge of widespread abuses, and this deficiency was the "cause-in-fact" of Griffin's constitutional violation.

Here, Plaintiff has failed to provide any evidence showing either deliberate indifference, a pattern of documented abuses, or an affirmative link between the alleged failure and his injury. Plaintiff asserts French and Gladden failed to train PPD officers in adequate alternative restrain and arrest techniques to prevent encounters involving armed suspects from becoming volatile or dangerous to the officers. Further, Plaintiff contends—without providing any evidence—this failure constitutes "failures of policy, widespread practice, and/or custom," and that Defendants are liable for the "systemic, unconstitutional training practices or policies alleged herein." (Doc.

No. 1-1, p. 28). However, these allegations are insufficient to show that the requisite widespread abuses existed, and that French and Gladden disregarded them. Plaintiff has not presented any evidence to support this contention. Thus, this element is not satisfied.

Finally, Plaintiff is similarly unable to satisfy the third element of a malicious prosecution claim because he cannot show French and Griffin's failure caused his injury. This requires demonstrating "a close affirmative link between [the supervisor's] conduct and a resulting constitutional violation by a subordinate." Cooper, 896 F.2d at 451 (quoting Jones v. Wellham, 104 F.3d 620, 628 (4th Cir. 1997)). Plaintiff contends—again, without evidence or explanation—French and Griffin's failure to train Griffin in alternative methods of confronting armed suspects proximately, directly, and foreseeably caused Griffin to use force that was foreseeably ineffective at subduing him, instead of safely gaining control of him or simply speaking with information to obtain the probable cause needed to effectuate an arrest. However, as explained above, Griffin's use of deadly force was justified; he was thus not required to use the alternative methods Plaintiff identifies. As such, even if Griffin was not properly trained in such methods at the time of the shooting, this did not result in Plaintiff's injury.

Therefore, because Plaintiff did not produce evidence sufficient to satisfy the required elements, the Court holds judgment as a matter of law in Defendants' favor is appropriate as to Plaintiff's Section 1983 failure to train and/or supervise claim.

**B.    State Law Claims**

In addition to the federal claims, Plaintiff asserts derivative state law claims of assault and battery, malicious prosecution, and false arrest. The Court will discuss each claim in turn, both based on public official immunity and on the merits, to determine whether Plaintiff has produced enough evidence to survive summary judgment.

Under North Carolina law, public official immunity "protects public officials performing discretionary acts under color of authority from suit in their individual capacity." Evans, 703 F.3d at 656–57; see also Smith v. State, 222 S.E.2d 412 (N.C. 1976) (quoting Smith v. Hefner, 68 S.E.2d 783 (N.C. 1952)) ("a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto."). Generally, where an officer defendant is entitled to qualified immunity for a Section 1983 claim, the officer is likewise entitled to public official immunity on derivative state law claims. Cooper, 735 F.3d at 160 ("[T]he analysis of a public officer's immunity is functionally identical to our discussion of the Officer's entitlement to qualified immunity with respect to § 1983 claims."). North Carolina law "presumes that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law." Knibbs v. Momphard, 30 F.4th 200, 227 (4th Cir. 2022) (quoting Doe v. City of Charlotte, 848 S.E.2d 1, 12 (N.C. Ct. App. 2020).

However, a plaintiff can overcome this presumption, and public officials will not be shielded, by showing the official's actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Wilcox v. City of Asheville, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012). "[E]lementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Knibbs, 30 F.4th at 227 (quoting Wilcox, 730 S.E.2d 226, 288). Evidence of malice "must be sufficient by virtue of its reasonableness, not by mere supposition. It must be factual, not hypothetical; supported by fact, not by surmise." Doe, 848 S.E.2d at 24 (quoting Strickland v. Hedrick, 669 S.E.2d 61, 68 (N.C. App. 2008)); see also Slade v. Vernon, 429 S.E.2d 744, 747 (N.C. Ct. App. 1993) ("Mere allegations of malice without more are insufficient to overcome a motion for summary judgment."), implied overruling on other

grounds, <u>Leonard v. Bell</u>, 803 S.E.2d 445 (N.C. Ct. App. 2017).

### 1. Assault and Battery Against Roberts and Griffin

Plaintiff's claim for assault and battery against Roberts and Griffin under North Carolina law tracks Plaintiff's Section 1983 excessive force claim. Like the Fourth Amendment reasonableness standard, N.C. Gen. Stat. § 15A-401(d)(2)(a) provides,

> A law-enforcement officer is justified in using deadly physical force upon another person . . . only when it is or appears to be reasonably necessary thereby:
> a.  To defend himself or a third person from what he reasonable believes to be the use or imminent use of deadly physical force; [or]
> b.  To effect an arrest or to prevent the escape from custody of a person … who by his conduct or any other means indicates that he presents an imminent threat of death or serious physical injury to others unless apprehended without delay . . . .

Thus, North Carolina law recognizes assault and battery by a law enforcement officer as a cognizable civil claim if the plaintiff can demonstrate the force used was excessive. <u>Glenn-Robinson v. Acker</u>, 538 S.E.2d 601, 615 (N.C. Ct. App. 2000) (<u>quoting</u> <u>Fowler v. Valencourt</u>, 423 S.E.2d 785, 790 (1992), <u>rev'd in part on other grounds</u>, 435 S.E.2d 530 (N.C. 1993). As Defendants correctly assert, North Carolina courts have embraced <u>Graham v. Connor's</u> objective reasonableness standard in analyzing the appropriateness of an officer's use of force. <u>See</u> <u>Estate of Fennell v. Stephenson</u>, 528 S.E.2d 911, 917 (N.C. Ct. App. 2000), <u>rev'd in part on other grounds</u>, 554 S.E.2d 629 (N.C. 2001) (applying the reasonableness standard to affirm the dismissal of a wrongful death suit against a police officer defendant); <u>Little v. Smith</u>, 114 F. Supp. 2d 437, 445 (W.D.N.C. 2000) ("Since the North Carolina Constitution is co-extensive with the Constitution of the United States on the issue of excessive force, the state constitutional claim must fail for precisely the same reasons."). The Fourth Circuit has held "[t]he parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well" only if the federal excessive force claim survives summary judgment. <u>Rowland</u>

31

v. Perry, 41 F.3d 167, 174 (4th Cir. 1994); see also Thomas v. Holly, 533 Fed. App'x 208, 223 (4th Cir. 2013) ("Plaintiff's assault and battery claims go the way of Plaintiff's § 1983 excessive force claims."). Thus, the "viability of the state law claims hinges on the objective reasonableness of the Officer Defendants' actions." Bates v. Chesterfield Cnty., 216 F.3d 367, 372 n.2 (4th Cir. 2000) (holding that because the defendants' actions were objectively reasonable, summary judgment on the state law claims was appropriate).

Because the Court found Roberts and Griffin are entitled to qualified immunity on the federal claim, they are likewise entitled to public official immunity on the assault and battery claim unless Plaintiff has produced sufficient evidence to overcome its presumptive application. See Cooper, 735 F.3d at 160. Further, for the reasons set forth above, the Court finds Roberts and Griffin were justified in using deadly force under N.C. Gen. Stat. § 15A-401(d)(2)(a). Thus, Plaintiff's "parallel" claim for assault and battery, and his arguments in support, fail.

Plaintiff contends public official immunity does not apply because the category of tort asserted does not belong to the class of torts for which public official immunity is available. Plaintiff accurately cites several cases holding that the immunity presumption applies only to negligence, not to intentional torts. While some North Carolina courts have so held, others have applied public official immunity to intentional torts. Maney v. Fealy, 69 F. Supp. 3d 553, 564–565 (M.D.N.C. 2014)[12]; see Schlossberg v. Goins, 540 S.E.2d 49, 56–57 (N.C. Ct. App. 2000); Turner v. City of Greenville, 677 S.E.2d 480, 485 (N.C. Ct. App. 2009); Campbell v. Anderson, 576 S.E.2d 726, 730 (N.C. Ct. App. 2003). Addressing this split, the Supreme Court of North Carolina recently held that in "the context of intentional tort claims, including assault and battery,

---

[12] In discussing whether public official immunity applies to intentional torts, the Court in Maney outlined the conflicting cases addressing this question and held that "rather than making the general statement that all intentional torts include the element of malice and are therefore not subject to dismissal pursuant to the public immunity doctrine, the correct approach is on a tort by tort basis." Maney, 69 F. Supp. 3d at 565.

'[w]anton and reckless behavior may be equated with an intentional act,' and 'evidence of constructive intent to injure may be allowed to support the malice exception to [public official] immunity.'" Bartley v. City of High Point, 873 S.E.2d 525, 534 (N.C. 2022) (quoting Pleasant v. Johnson, 325 S.E.2d 244 (N.C. 1985); Wilcox, 730 S.E.2d at 226). Additionally, the Fourth Circuit has previously applied the presumption of immunity to assault and battery claims asserted under North Carolina law. See, e.g., Thomas, 533 Fed. App'x at 224; Rowland, 41 F.3d at 174; Bates, 216 F.3d 372 n.2. Thus, this Court rejects Plaintiff's argument, and now must determine whether Plaintiff has presented sufficient evidence to rebut its presumptive application here.

Of the three public official immunity exceptions, the first two are not applicable here. Plaintiff contends Roberts and Griffin exceeded the scope of their lawful authority through their use of excessive force. However, the Court has already determined deadly force was reasonable, and the officers thus "exercised their judgment and discretion within the scope of their official authority." See Barnett v. Karpinos, 460 S.E.2d 208, 213 (N.C. Ct. App. 1995). Because Plaintiff does not allege, nor does the record support, any evidence of corruption, the only avenue for overcoming immunity is if the officers acted with malice.

Plaintiff next argues there is an issue of material fact as to whether Defendants Robert and Griffin acted with malice, in that the officers intentionally shot at him, which was an "excessive, inappropriate response to the situation at hand . . . with such reckless indifference to the health, safety, and rights of Plaintiff that they intended, at least constructively, to harm him." (Doc. No. 1-1, p. 29). Thus, Plaintiff argues Roberts and Griffin maliciously used excessive force against him, particularly because evidence conclusively establishes that Officer Griffin knew in the moment that he was firing upon a suspect who had already been shot and lay motionless. However, the Court has already found the officers' response to the circumstances was objectively

reasonable, which refutes Plaintiff's allegation of malice. Plaintiff presents no evidence showing the officers' actions were wanton—"done of wicked purpose, or . . . needlessly, manifesting a reckless indifference to the rights of others"—rather, they responded reasonably to the threat of an armed suspect withdrawing a firearm. See In re Grad, 321 S.E.2d at 890–91. Neither does Plaintiff present evidence they were acting contrary to their duty in so responding. Plaintiff instead contends they intended, at least constructively, to harm him. North Carolina courts have held that "direct excessive force causing serious or fatal injury can be sufficient to survive . . . summary judgment on the question of constructive intent to harm," R.A. v. Johnson, 36 F.4th 537, 546 (4th Cir. 2022), However, because the officers' use of force was not excessive, Plaintiff's constructive intent theory fails.

Therefore, the Court holds that because Plaintiff's allegations do not run afoul of Graham's objective reasonableness test and the officers are entitled to public official immunity, Defendants are entitled to summary judgment as a matter of law on Plaintiff's state law assault and battery claims.

### 2. Malicious Prosecution Against All PPD Defendants

Plaintiff next raises a state law claim for malicious prosecution against all PPD Defendants. Plaintiff's Complaint alleges that despite knowing that probable cause did not exist, the PPD Defendants intentionally, recklessly, and with malice, caused Plaintiff to be arrested, held on bail, and prosecuted. Again, the Court finds this claim fails based on public official immunity and on the merits.

In North Carolina, a plaintiff must establish four elements to succeed on a malicious prosecution claim: "(1) defendant initiated the earlier proceeding; (2) malice on the part of defendant in doing so; (3) lack of probable cause for the initiation of the earlier proceeding; and

(4) termination of the earlier proceeding in favor of the plaintiff." Best v. Duke Univ., 448 S.E.2d 506, 510 (N.C. 1994). Thus, the state law claim mirrors the federal Section 1983 claim for malicious prosecution. Evans, 703 F.3d at 647. As set forth above, there was probable cause for Plaintiff's arrest, precluding Plaintiff's claim on the merits. Further, the malicious prosecution claim fails based on qualified immunity.

Defendants are entitled to public official immunity on Plaintiff's state-law malicious prosecution claim to the same extent as they are entitled to qualified immunity on the federal claim. Defendants asserted public official immunity as an affirmative defense to all Plaintiff's state law claims, but beyond that, neither party has briefed the issue. Nevertheless, to overcome the presumption of immunity, Plaintiff's evidence must demonstrate his arrest, imprisonment, and prosecution was either outside the scope of the PPD's official authority, was done with malice, or was corrupt. Wilcox, 730 S.E.2d at 230. Plaintiff did not allege, nor does his evidence support, the existence of corruption. Further, the Court has already determined probable cause existed for Plaintiff's arrest, which precludes a finding that the PPD Defendants acted beyond the scope of their authority. Plaintiff's only contention, then, is that they acted maliciously.

However, Plaintiff offers no facts or evidence to support malice; the only basis for his claim lies in his belief that the officers' lacked probable cause to arrest him. (Doc. No. 18, p. 23). As outlined above, even viewing Plaintiff's arguments in the light most favorable to him—such that there was not probable cause for three of the five charges against him—his assertions still fail to show malice. Thus, where—as here—"a complaint offers no allegations from which . . . malice might be inferred, the plaintiff has failed to show an essential element of his claim, and summary judgment" is appropriate. Price v. Davis, 512 S.E.2d 783, 788 (N.C. Ct. App. 1999).

Plaintiff has not produced any other evidence supporting his state law malicious

prosecution claim, nor has he produced any reason showing it should receive a different outcome than the analogous claim asserted under Section 1983. Because probable cause existed for his arrest, Plaintiff's claim fails not only because Defendants are shielded by public official immunity, but also on the merits. Defendants are entitled to summary judgment as a matter of law on Plaintiff's state-law malicious prosecution claim.

### 3. False Arrest Against All PPD Defendants

Plaintiff's final state law claim is for false arrest against all PPD Defendants. In North Carolina, "a cause of action in tort will lie for false imprisonment, beads upon the 'illegal restraint of one's person against his will.' A false arrest, *i.e.*, one without proper legal authority, is one means of committing a false imprisonment." Myrick v. Cooley, 371 S.E.2d 492, 494, disc. rev. denied, 373 S.E.2d 865 (1988) (quoting Mobley v. Broome, 102 S.E.2d 407, 409 (N.C. 1958), overruled on other grounds by Fowler v. Valencourt, 435 S.E.2d 530 (N.C. 1993)). However, "[p]robable cause is an absolute bar to a claim for false arrest." Williams v. City of Jacksonville Police Dept., 599 S.E.2d 422, 430 (N.C. Ct. App. 2004) (citations omitted). Further, where the arrest is made pursuant to a warrant, "[probable cause for an arrest is presumed valid unless plaintiff presents 'allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'" Beeson v. Palombo, 727 S.E.2d 343, 348 (N.C. Ct. App. 2012) (citation omitted). Thus, as above, whether public official immunity applies and whether Plaintiff's claim can avoid summary judgment on the merits both turn on whether probable cause existed for his arrest.

First, Defendants are entitled to public official immunity as to the false arrest claim. To overcome the protection of public official immunity, Plaintiff had to show that a genuine issue of material fact existed as to whether Defendants acted either outside the scope of their authority,

with malice, or corruptly, in arresting Plaintiff. Plaintiff cannot do so for two reasons. First, Defendants did not actually arrest Plaintiff, so they could have not arrested him beyond the scope of their authority, maliciously, corruptly. Second, while Plaintiff does allege in his Complaint that his "claim[] for false arrest . . . must not be dismissed because the material facts are in substantial dispute," nowhere his Complaint, briefings, or exhibits "does Plaintiff allege or forecast evidence of malicious or corrupt conduct on the part of" the PPD Defendants. Jones v. Kearns, 462 S.E.2d 245, 248 (N.C. Ct. App. 1995). Thus, "this allegation, standing alone, does not satisfy plaintiff's burden," id., and the Court finds Defendants are entitled to public official immunity on Plaintiff's false arrest claim.

Second, based on the record, Plaintiff's false arrest claim fails on the merits. Plaintiff contends the officers lacked both a reasonable suspicion that Plaintiff was guilty of any crime and probable cause to arrest him when they took Plaintiff into custody through physical force.[13] However, Defendants point out, and Plaintiff does not dispute, that Plaintiff was not arrested by the PPD but rather by the CMPD. Further, it is also undisputed that the arrest did not take place at the scene of the shooting but instead occurred forty-eight hours later upon his discharge from the hospital. (Doc. No. 11, p. 15). Even more destructive to Plaintiff's claim for false arrest is the fact that the CMPD arrested Plaintiff pursuant to four pre-existing, unrelated arrest warrants, and Plaintiff does not dispute their adequacy. (Doc. No. 10-7, p. 2–6). Therefore, the existence of probable cause serves as a complete bar to this claim. The Court already determined Plaintiff failed to present evidence demonstrating the probable cause relied on Defendants' deliberate

---

[13] Plaintiff also asserts that before he was seized "by the PPD, Plaintiff had committed no criminal offense" in the officers' presence, and that the officers "failed to inform Plaintiff of the cause of the arrest because the cause was not evident at the time." Id. at 31–32. However, these arguments are without merit. First, to the extent that he was temporarily seized when he was handcuffed after the shooting, such restraint was justified and was terminated when first responders took Plaintiff to the hospital. (Doc. No. 16-7, p. 27). Further, the record does not contain any evidence the PPD officers ever effectuated Plaintiff's arrest, and as such his second contention has no effect.

falsehood or reckless disregard for the truth. As such, Plaintiff's false arrest claim fails.

In sum, the Court holds summary judgment is appropriate as to all Plaintiff's state law claims. Further, because Plaintiff has failed to produce any evidence showing Defendant City of Pineville is otherwise liable, Defendant City of Pineville is entitled to judgment on all Plaintiff's claims as well. Accordingly, the Court holds Defendants are entitled to summary judgment as a matter of law as to all Plaintiff's claims, and Defendants' Motion for Summary Judgment (Doc. No. 10) is therefore GRANTED.

## IV. <u>CONCLUSION</u>

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. No. 10) is GRANTED, and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 13) is DENIED.

IT IS SO ORDERED.

Signed: November 3, 2022

Frank D. Whitney
United States District Judge